THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* FRANK MARTINO, Appellant.

Third Department, March 8, 1939.

*King & Duval [Carleton J. King* of counsell, for the appellant.
*Alfred L. Simon, District Attorney*, for the respondent.

HILL, P. J.   The defendant appeals from a judgment of the Saratoga County Court convicting him of burglary in the third degree, for which he has been sentenced to serve not less than ten years nor more than twenty in Clinton Prison, and of grand larceny in the second degree, for which he has been sentenced to serve not less than five years nor more than ten, the sentences to run concurrently.

The subject-matter of the theft was a lady's Chippendale desk of unquestioned antiquity, of the value of $1,000 to $1,500.   It belonged to a Mrs. Thomas, who owned a residence and resided a portion of each year at No. 34 Circular street, Saratoga Springs, N. Y.   She closed her home, leaving the desk in its usual position, about December 1, 1937, and removed to Long Island.   The defendant sold the desk on January 13, 1938, for $750 to Lyons, an antique dealer with a place of business at 20 East Fifty-sixth street, in the city of New York.   Ballou, a police officer of Saratoga Springs, on January twenty-third discovered that the Thomas home had been entered through the rear door, called Mrs. Vrooman, a daughter of Mrs. Thomas, who resided in Saratoga Springs, who accompanied him to the premises.   They found that the desk was gone.   The antique dealer, Lyons, had seen the desk at Mrs. Thomas' home several years before he acquired it from the defendant.   Some member of Lyons' firm saw the account of the burglary and theft and communicated with the Saratoga authorities.   Upon these facts, unexplained, a conviction would be sustained unless there were prejudicial errors during the trial.

Defendant's explanation is that two men giving the names Dave Shapiro and Harry Hastell or Haskell, came to him on January twefth at a bowling alley in Saratoga Springs and requested that he go with them to New York to sell the desk.   He is corroborated by a man who saw two strangers conversing with him at the bowling alley at about this time, and by his sister and a friend who each testified that two strangers called at his residence inquiring where

he could be found.    Defendant says he thought he had seen Haskell some time previously at the shop of an antique dealer in Fonda. He consented, went with them, called at Lyons' place of business, he says commissioned to sell the desk, he to receive anything above $1,000.    Upon the refusal of Lyons to pay that amount he left and says he conferred with the men whom he was representing, and they directed him to sell it at a price which would return to them $700, he to have any additional money which he received; that he obtained $750, delivered $700 to Shapiro, took a receipt, which he presented upon the trial, and kept the balance.    Defendant had sold antique articles to Lyons on earlier occasions and had exhibited others which were not purchased.    He was regularly employed by Mrs. Eddy, an antique dealer living at Saratoga Springs, for whom he purchased, sold and refinished antique furniture.    Mrs. Eddy had long known of the Thomas desk and its value, but she says that she never mentioned it to the defendant and that he had never spoken of it to her.    She had, some years earlier, taken the antique dealer Lyons to the Thomas home and introduced him to Mrs. Thomas as Mr. Thatcher and he attempted to purchase the desk.    Lyons says the defendant told him on January thirteenth that he represented two men who had purchased this desk in Saratoga, but Lyons also says that in November, 1937, when defendant sold him a " Lounsdorf " bowl he inquired, " Will you ask Mrs. Eddy if she has been able to do anything about the lady's desk," to which defendant replied, " What is the desk? "    and Lyons said, " It is a high desk with ball and claw feet. If you tell her she will know."    He says that he did not tell defendant the name of the woman who owned the desk, and that on the occasion of the visit when the desk was sold he said to the defendant, " What was the matter with Mrs. Eddy; why didn't she buy it? " and defendant answered that he did not know.    Defendant denies the conversations concerning Mrs. Eddy and the desk.

Some time prior to this affair Mrs. Eddy introduced to Mrs. Vrooman a Dave Shapiro and a Mr. Aaron who were anxious to purchase the desk.    Upon the trial the latter Dave Shapiro was a witness and apparently not connected with the criminal transaction.    The officer, Ballou, inspected the rear door of the Thomas premises on January fifteenth.    He had placed two milk bottles outside the screen door which would necessarily be moved if an entrance through that door was made.    These were in place and so far as he observed the door was in its normal condition.    The desk had been sold two days earlier.    From these circumstances defendant argues that the desk had been removed through some other door by a person who had a key.    The same officer inspected

the premises on January twenty-third, when he saw that the milk bottles had been moved, a pane of glass removed from the door, and other evidences of burglary.

The foregoing circumstances and defendant's lack of furtiveness in selling the desk to an antique dealer with whom he was acquainted, and who, he knew, was acquainted in Saratoga Springs, and accepting in payment a check drawn to himself, made a substantial defense to the charge, and require that more consideration be given to errors than as if the defendant's guilt was unquestioned.

It is argued that error was committed by the district attorney in the use upon cross-examination of the defendant of an affidavit made by one of defendant's attorneys, and used on a motion to inspect the minutes of the grand jury which returned the indictment. The district attorney asked the defendant, " Q. Did you state to Mr. Duval, your attorney, the following — By 'Mr. King (Intg): I object to the reading of any statement of Mr. Duval's in the affidavit on the ground that it is hearsay as to this defendant and not binding on him. By Mr. Simon: It is an admission. By Mr. King: It isn't an admission; counsel can be mistaken in drawing an affidavit. By Mr. Simon: Counsel can so state. By Mr. King: It isn't proper, what his counsel told him and that he told his counsel in the affidavit. By the Court: Are you going to read from an affidavit made by Mr. Duval? By Mr. Simon: That is correct. By the Court: Sustained." The colloquy between court and counsel occupied two more pages, and then the following: " By Mr. King: I think it is a privileged communication. By Mr. Simon: It is privileged, but when he takes the stand, he is opening the door to be confronted with any statement that he has made. By the Court: I will permit you to ask the question of the witness as to whether he made any particular statement to his counsel at any particular time, but to identify it with that affidavit that you have in your hand is improper. * * * By Mr. Simon: I think I have a right to refer to any paper that I have in my files. By the Court: I will allow you to ask the question as I have indicated." This was followed by many questions all concerning statements made by defendant to his counsel. I quote a few: " By Mr. Simon: Mr. Martino, did you ever say to your counsel, Mr. Duval, that these two men asked you if you knew Charles Lyons in New York? A. I don't believe so. Q. (by Mr. Simon) Did you also say to Mr. Duval that you told these men that you didn't know Charles Lyons but that Charles Lyons knew — did you say to Mr. Duval that you didn't know Charles Lyons, and that is what you so told these men? A. I don't remember saying that. Q. That you say you don't remember; you don't deny making that

statement to him? A. I might have said it. Q. Did you tell Mr. Duval that you told these men that your employer, Mrs. Eddy, knew Mr. Lyons? A. I cannot say for sure if I told him that; I might have told him that. Q. Did you say to Mr. Duval that these men said to you, ' Come on; we will got (sic) to New York tomorrow and see if we can't sell this desk to Lyons? ' A. I don't recall saying that."

It goes without saying that statements made to an attorney in an affidavit are not admissions which may be used against his client, and further, waiving the hearsay rule and assuming that all the information upon which the attorney made the affidavit, had been obtained from the client, it was privileged and confidential as against the client upon his trial. The free use of the affidavit by the district attorney upon the trial justified the jury in believing that this defendant was telling a different story on the witness stand than he had told his attorney. This was harmful and prejudicial.

The second error was the defendant's cross-examination by the district attorney in reference to a shortage in defendant's accounts as treasurer of a clam-bake committee. " Q. Were you ever treasurers (sic) of the Taxi Drivers Organization for a while? A. I was no treasurer. Q. Were you treasurer for the clam-bake that they were putting on? A. I was. Q. And didn't you have about $550 — By Mr. King (Intg): I object to what he did for the taxi drivers association; it has nothing to do with this case. By the Court: I will let him finish his question before I rule on it. Q. Weren't you treasurer for this clam-bake and did you have in your possession $550 belonging to the taxi drivers? A. No. Q. Did you have any sum of money belonging to them? A. Ninety dollars. Q. And is it a fact that you were robbed in your house of that ninety dollars? By Mr. King: I object to it. By the Court: Sustained. By Mr. King: I move to strike it out and ask that the jury be instructed to disregard it. By Mr. Simon: I think it goes to the credibility of this witness. (No ruling.) " The district attorney after a period again propounded this question: " Q. Did you say yesterday, Martino, that you had some ninety-odd dollars of the taxi drivers' money — By Mr. King (Intg): I object to it as already having been testified to, Your Honor, and I object to any further questions along this line. Overruled and exception. A. I did have about ninety dollars of the taxi drivers' money. Q. Did you ever turn the money over to them? A. I didn't. By Mr. King: I object to this. Overruled and exception. Q. Why didn't you? A. Because I couldn't; I got robbed last summer of $550. Q. Did you ever have anyone arrested for that

robbery? A. They couldn't find them; they were around the Chicago Club and around. At that time, there were many robberies in Saratoga Springs; many persons got stuck up in Saratoga. Q. Did you look for them? A. Yes. Q. Did you describe the men to the police? A. I did describe the men to the police. Q. But you never have been able to find one of them? A. One of them I knew before by the name of ' Jimmie.' A. Is his name ' Jimmie Shapiro? ' A. No, sir."

This testimony tended to show the defendant guilty of an entirely separate crime of larceny for withholding money in his possession as treasurer of the clam-bake committee and of telling an untrue story of being robbed to justify his defalcation. He had no opportunity to interpose a defense to this new charge for which he had not been indicted. His case for the theft of the desk went to the jury prejudiced by this second charge of larceny. The effect of these two errors was not lessened by the charge of the court, as they were not mentioned.

This defendant has been sentenced for a long term of imprisonment which he should not be required to serve until convicted by a jury after a trial reasonably free from prejudicial errors. The People may well argue that the defendant's story as to meeting the two strange men is corroborated only by his sister and two rather close friends. These mysterious men, however, may be matched against the phantomlike removal of the desk through an unopened door at least two days in advance of the time when the forceful breaking into the house occurred.

The errors which have been detailed at length require a reversal and a new trial.

McNAMEE and HEFFERNAN, JJ., concur; RHODES, J., dissents, with an opinion, in which CRAPSER, J., concurs.

RHODES, J. (dissenting). It seems to me the record justifies the conviction, and the cross-examination of the defendant, which tended to show that he had previously been guilty of theft, was not erroneous. When the defendant took the stand he was subject to cross-examination to the same extent as any other witness, subject to his right to refuse to answer on the ground that his answers would tend to incriminate him, and it was competent to examine him as to specific acts for the purpose of affecting his credibility as a witness. (*People* v. *Johnston*, 228 N. Y. 332.)

The defendant may thus be questioned as to any criminal, vicious or disgraceful acts in his life for the purpose of impeaching his credibility. It is true that, except for impeachment purposes, the prosecution is not permitted to show that defendant has been

guilty of other crimes. (*People* v. *Grutz*, 212 N. Y. 72; *People* v. *Molineux*, 168 id. 264; *People* v. *Dolan*, 186 id. 4; *People* v. *Katz*, 209 id. 311.)

The alleged prejudicial conduct of the district attorney in cross-examining the defendant as to whether he had made certain statements to his attorney, which statements were apparently contained in an affidavit, is not of itself of sufficient importance to justify reversal. The court refused to permit the district attorney to read from the affidavits, but stated to the district attorney that he might ask the defendant if he had not stated certain specific things to his attorney.

The jury was justified in regarding the story told by the defendant as fanciful; the defendant was shown to be in possession of the stolen property shortly after the theft.

I, therefore, dissent.

CRAPSER, J., concurs.

Judgment of conviction reversed on the law and facts, and new trial ordered.